# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 18-1288V**
**Filed: July 23, 2026**

* * * * * * * * * * * * * * * * * * * * * * * * *

CYNTHIA PRYOR and FREDDIE PRYOR JR., *on behalf of their minor child, I.P.*,

Petitioners,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

* * * * * * * * * * * * * * * * * * * * * * * * *

*Alison Haskins*, Siri & Glimstad, LLP, Aventura, FL, for Petitioners.
*Ryan P. Miller*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION DENYING ENTITLEMENT[1]

**Shah,** Special Master.

On August 24, 2018, Cynthia and Freddie Pryor Jr. ("Petitioners" or "Mr. and Mrs. Pryor"), parents of I.P., filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"). ECF No. 1 ("Pet."). Petitioners allege that I.P. developed chronic nonbacterial osteomyelitis ("CNO") as a result of the

[1] This Decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). This means the Decision will be available to anyone with access to the internet. As provided in 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. To do so, each party may, within 14 days, request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, this Decision will be available to the public in its present form. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. For ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Pediarix (tetanus, diphtheria, acellular pertussis, hepatitis B, and polio), MMR (measles, mumps, and rubella), and varicella vaccinations she received on September 10, 2015. *Id.*

After a full review of the evidence submitted, for the reasons discussed below, I deny entitlement. Even assuming that I.P. developed the injury alleged, the evidence did not preponderantly establish that the vaccinations that I.P. received caused that injury.

## I. PROCEDURAL BACKGROUND

Petitioners filed their claim on August 24, 2018. They filed a statement from Mrs. Pryor and medical records on September 6, 2018. Exs. 1-5.

After Respondent indicated that he intended to defend this claim, Petitioners filed an expert report from Thomas Zizic, M.D., with his CV and supporting medical literature. Exs. 6-24. Respondent filed his Rule 4(c) Report on October 10, 2019, recommending against compensation. ECF No. 21 ("Resp't's Rep.") at 1. The same day, Respondent filed an expert report from Hayley Gans, M.D., along with her CV and supporting literature. Exs. A-K. Both parties later filed supplemental expert reports with additional literature. Exs. 25-27; Exs. L-Q.

Former Special Master Thomas Gowen held an entitlement hearing on September 21-22, 2022, at which Mrs. Pryor and Drs. Zizic and Gans testified. *See* Minute Entry dated 9/22/2022. On January 13, 2023, Petitioners filed a post-hearing brief. ECF No. 68 ("Pet'rs' Post-Hrg. Br."). Respondent filed a responsive post-hearing brief on February 8, 2023. ECF No. 68 ("Resp't's Post-Hrg. Br."). On March 16, 2023, Petitioner filed a reply brief. ECF No. 70 ("Pet'rs' Reply Br.").

This case was transferred to my docket on February 24, 2026. ECF No. 75. This matter is ripe for adjudication.

## II. FACT EVIDENCE

### A. Medical Records

I.P. was born on May 17, 2013. At her two-year well-child visit on May 29, 2015, I.P. had no significant health concerns and appeared to be developing in a manner appropriate for her age, with some behavioral concerns. Ex. 2 at 51-52. At this visit, I.P. received an initial dose of the hepatitis A vaccine, along with second doses of the Pediarix, Haemophilus influenzae type b ("Hib"), and pneumococcal ("Prevnar") vaccines. *Id.* at 52.

On September 10, 2015, I.P. had a vaccination appointment with her pediatrician and received the subject Pediarix, MMR, and varicella vaccines. Ex. 2. at 47-48.

Seventy-eight days later, on November 27, 2015, I.P. was brought to Banner Health Emergency Room ("ER") by her parents for a reported "left leg injury" that occurred the previous day, when she might have dropped a bowling ball on her foot. Ex. 5 at 66. I.P.'s parents reported that earlier that day, she had "jumped off of the bed, but did not complain of the pain," but she

later began to limp and "now refuses to walk on her leg." *Id.* Mr. Pryor reported that I.P. "felt warm" the night before, but her parents did not take her temperature. *Id.* They had given her Tylenol one hour before going to the ER. *Id.* In the ER, her temperature was 39.6˚C (or 103.3˚F). *Id.* Her blood pressure was elevated. *Id.* at 67. It was noted that there was "extensive soft tissue swelling around [left] distal femur [with] small knee effusion. [F]ever CBC CMP CRP elevated… still limping with ambulation." *Id.* at 70. I.P. was prescribed a course of antibiotics for an upper respiratory infection ("URI"). *Id.* At the time of discharge, she was still walking with a limp. *Id.*

Thirty-three days later, on December 30, 2015, I.P. was brought to the Phoenix Children's Hospital ("PCH") urgent care for evaluation of a limp of one week. Ex. 2 at 161. I.P.'s parents reported that she had fallen off the bed around Thanksgiving and had made a full recovery with negative x-rays of the left leg. *Id.* One week earlier, she began to limp again. *Id.* Her parents denied that she had experienced "fever, vomiting, rash or recent illness" in the preceding six weeks. *Id.* at 162. During the physical exam, I.P. had an antalgic gait and was "favoring" her right leg.[3] *Id.* at 163. X-ray images of I.P.'s right femur showed a "[f]ocal area of lucency of the proximal right femoral neck with surrounding sclerosis." *Id.* at 166. The impression was: "Focal osseous findings seen of right femoral neck adjacent to the growth plate. While finding is nonspecific it could relate to an area of infectious or inflammatory change possibly even developing Brodie's abscess.[4]" *Id.* I.P. was sent to the main hospital at PCH. *See* Ex. 4 at 201.

At the time of admission, Mrs. Pryor gave a detailed medical history, recounting that I.P. had a cough and fever that began weeks earlier. Ex. 2 at 200. The fever resolved, but I.P.'s cough remained. *Id.* For the past week, Mrs. Pryor had observed I.P. limping, "favoring" her right leg, and acting "fussier," with a "decreased level of activity." *Id.* Earlier that day, I.P. had stopped playing at the park and started asking to be carried everywhere. *Id.* On exam, I.P. did not demonstrate any pain with passive movement of her legs and hips. *Id.* at 202. I.P.'s labs reflected an elevated C-reactive protein ("CRP") and a slightly increased lactate dehydrogenase ("LDH"), leading the physicians to suspect her condition was caused by "infectious and anatomic variants" rather than a malignancy. *Id.* at 203.

On December 31, 2015, I.P. had an MRI of her right lower leg, which showed:

> Focal area of high T2/low T1 signal abnormality with associated enhancement seen in the right proximal femoral metaphysis, corresponding to the lucency seen on the plain radiograph. At this level there is also similar signal abnormality with associated enhancement in the right femoral epiphysis.

Ex. 4 at 240. This finding was concerning for osteomyelitis. *Id.* at 241. I.P. was diagnosed with "subacute osteomyelitis of femur" and prescribed IV antibiotics. *Id.* at 214.

---

[3] This record indicates that I.P. was "favoring" her right lower extremity. Given the circumstances, it appears "favoring" meant that I.P. was reducing the use of her right lower limb.

[4] Brodie abscess: a roughly spherical region of bone destruction, filled with pus or connective tissue, usually found in the metaphyseal region of long bones and caused by *Staphylococcus aureus.* Brodie abscess, Dorland's, https://www.dorlandsonline.com/dorland/definition?id=54334 (last accessed on July 2, 2026).

I.P. received four days of IV antibiotics and was discharged from PCH on January 4, 2016. Ex. 4 at 154. During her hospitalization, her inflammatory markers improved, but at discharge she was still walking with a limp, requiring the use of Tylenol and ibuprofen. *Id.* She was discharged with a six-week course of oral antibiotics and weekly bloodwork until symptoms resolved. *Id.*

I.P. returned to the pediatrician on February 23, 2016, for a two-day history of a fever of 102°F and cough. Ex. 2 at 40. She had stopped her antibiotics four weeks earlier. *Id.* Around that time she also started limping again, favoring her right leg. *Id.* On exam, I.P. had a coarse crackle of the lungs and wheezing on exhalation. *Id.* at 41. Rapid strep and RSV tests were positive. *Id.* at 42. Tanya Pitts, M.D., diagnosed I.P. with RSV bronchiolitis and strep infection, prescribed amoxicillin and albuterol, and ordered an x-ray of the right leg.[5] *Id.*

On March 4, 2016, I.P. saw orthopedist Peter Masso, M.D., for subacute osteomyelitis of the right femur. Ex. 4 at 134. I.P.'s parents reported she had "no orthopedic complaints," but she was having spiking temperatures, as high as 106°F. *Id.* at 141. Her parents said she was "[r]unning, jumping around and seem[ed] to be fine." *Id.* at 138. Her musculoskeletal exam was normal; she exhibited a normal gait and stance with full range of motion of both hips, knees, and ankles, and no pain. *Id.* at 142. An x-ray taken the same day showed a "[s]light irregularity and sclerosis of the proximal femoral metaphysis"; the impression was that this "likely represent[ed] a healing process [but] chronic/subacute active infection not excluded." *Id.* at 143.

On March 6, 2016, I.P. was taken to the PCH emergency department ("ED") for a fever and cough. Ex. 4 at 106. She tested positive for influenza B and rhinovirus/enterovirus. *Id.* at 117.

On June 23, 2016, I.P. had her three-year well child appointment with Dr. Pitts. Ex. 2 at 33. Dr. Pitts noted that I.P.'s limp had resolved, and I.P.'s lower extremity physical examination was marked as normal. *Id.* at 36. I.P. received a fourth DTaP vaccination in her left thigh and a second Hepatitis A vaccine in her right thigh. *Id.* at 37.

On September 30, 2016, I.P returned to the PCH ED for a two-day history of "intermittent crampy abdominal pain that seems periumbilical." Ex. 4 at 66. The pain was described as constant but with exacerbations, with a fever. *Id.* I.P.'s urine tested positive for Shigella bacteria; she was prescribed ciprofloxacin and discharged. *Id.* at 70.

On December 5, 2016, Mrs. Pryor took I.P. to urgent care for a "worsening limp." Ex. 4 at 36. Mrs. Pryor reported that I.P. was experiencing a fever "every [third] day and daily leg warmth and mottling." *Id.* I.P.'s physical examination was normal, she was afebrile, and an x-ray of her right leg was normal. *Id.* at 37, 39.

I.P. had a follow-up appointment with Dr. Masso on December 22, 2016. Ex. 4 at 20, 25. Dr. Masso noted that since he had last seen I.P. in March 2016, she had been diagnosed with

[5] The records do not include any x-ray report from this visit.

shigellosis[6] and had been seen in the PCH ED for "worsening limp, intermittent fever," and leg warmth. *Id.* at 25. Mrs. Pryor reported that I.P. was experiencing low-grade fevers every three days and circular rashes on her legs, along with walking with a limp. *Id.* Dr. Masso did not observe a rash on the physical examination, and I.P. had full range of motion in her ankles, knees, and hips bilaterally. *Id.* An x-ray of I.P.'s right lower extremity was normal; the "previously seen focal lucent lesion in the right proximal femoral metaphysis" was no longer visible, and "no new lytic lesions" were identified. *Id.* at 28. Dr. Masso assessed a "history of osteomyelitis," noting: "The patient does not appear to [have] an infectious etiology for her episodic symptoms. Given the fevers and rashes every 3 days, this could be rheumatologic, and she should follow up with rheumatology as scheduled." *Id.* at 26.

I.P. had an initial rheumatology evaluation on January 5, 2017, with Michael Shishov, M.D. Ex. 4 at 7. The history stated:

> New consultation for evaluation of chronic, recurrent right leg pain. Has history of sclerosis of right proximal femoral metaphysis and epiphysis based on [x-ray] and MRI imaging. November 2015 fever above 101, on and off, and limping, right leg pain, entire leg, wasn't talking, was 2.5 years old, no previous injury, swelling around knee, admitted to PCH December 2015, x-ray showed lytic lesion around the right hip, no biopsy done, did antibiotics x 6 weeks, resolved completely in 3 months.
>
> October had another episode of right leg pain, worse limp, entire leg hurt, [ ] refuse[d] to bear weight, fever, went to PCP, had abdominal pain and shigellosis diagnosed, hasn't stopped limping since [O]ctober [2016], was less severe in 2 months; every 3 days she gets fevers 101-106 and refuses to walk for 1-2 hours; [Motrin] helps, has red, flat red rash over areas of pain, resolves with resolution of pain. Always limps "24/7." [C]ries every morning for 45 minutes, stiff [on] right side.

*Id.* at 12. An exam of I.P.'s right leg "did not reveal warmth, swelling, tenderness or pain with motion in any joints," and Dr. Shishov did not appreciate any difference in leg length, bony overgrowth, or muscle bulk, as would be associated with longstanding arthritis. *Id.* at 14. Dr. Shishov also observed I.P. "walked and ran down hall without limp." *Id.* Dr. Shishov commented:

> [I.P.'s] exam today was normal. Based on these facts, I doubt she is having ongoing osteomyelitis. She does not have concerns for arthritis or any other rheumatic process. Mom is obviously very concerned….[Differential diagnosis] includes [Chronic Recurrent Multifocal Osteomyelitis], which I favor based on the subacute

[6] Shigellos: any of the intestinal conditions produced by infection with species of Shigella, such as bacillary dysentery (see under *dysentery*). *Shigellos*, DORLAND'S MEDICAL DICTIONARY ONLINE ("DORLAND'S"), https://www.dorlandsonline.com/dorland/definition?id=45644 (last accessed on July 2, 2026).

> presentation in [D]ecember 2015. Unfortunately, no bone biopsy was done at that time, so it's impossible to make an accurate diagnosis currently.

*Id.* at 15.

On July 7, 2017, I.P. had her four-year well-child appointment with pediatrician Rudy Serino, M.D. Ex. 2 at 13-17. She was diagnosed with astigmatism, but her physical exam was otherwise normal. *Id.* at 13, 15-16. Additionally, I.P. received DTaP and polio vaccines in her left deltoid, and the MMR-V vaccine was administered subcutaneously in her left arm. *Id.* at 17-19.

I.P. had a sick visit with her pediatrician on August 31, 2017, complaining of a sore throat and an immobile right tympanic membrane. Ex. 2 at 9-11. I.P.'s rapid strep test was positive, and she was diagnosed with otitis media and streptococcal pharyngitis. *Id.* at 11. She was prescribed a 10-day course of amoxicillin. *Id.*

On December 5, 2017, I.P. returned to her pediatrician's office due to a failed hearing test at school and ongoing limp. Ex. 2 at 1. Mrs. Pryor reported that I.P. had failed the school's hearing test and had a speech evaluation due to concerns with articulation. *Id.* at 1. Mrs. Pryor also reported that I.P. was still walking with a limp and that the school had asked for a physical therapy evaluation. *Id.* I.P.'s hearing exam was normal, but she was observed to have tonsillar hypertrophy and possible eustachian tube dysfunction. *Id.* at 3. I.P. was referred to physical therapy for her ongoing limp. *Id.*

There are no medical records for 2018. The next medical appointment was from January 14, 2019, at Desert Valley Pediatrics. Ex. 28 at 23. At that time, I.P. was experiencing a headache, stomachache, and pain in her hands, legs, and back, and a sore throat. *Id.* She was positive for influenza A. *Id.* She was prescribed ibuprofen and Tamiflu and instructed to increase fluid intake and use saline and a humidifier. *Id.* at 25.

At I.P.'s five-year well-child visit on February 14, 2019, she was reportedly experiencing behavioral issues (whininess) and participating in weekly therapy. Ex. 28 at 17-18. I.P.'s grandmother reported that I.P. only complained of leg pain "once in awhile." *Id.* at 18. I.P. received a flu vaccine in her right deltoid at this appointment. *Id.* at 21.

### B. Mrs. Pryor's Affidavit[7]

Mrs. Pryor submitted an affidavit that was executed on August 21, 2018. Ex. 1 ("Pryor Aff."). She stated that I.P. had been an outgoing toddler in great health. Ex. 1 at 1. "About 6-8 weeks" after I.P. received the Pediarix, MMR, and varicella vaccinations on September 10, 2015,

[7] A second affidavit was submitted by Mrs. Pryor at the direction of former Special Master Gowen. Ex. 30. Because it is not relevant to the analysis of the evidence submitted in this case, I have not included it in this decision.

she noticed "huge changes in I.P.'s characteristics." *Id.* I.P. started getting fevers, chills, and was coughing, and she was very clingy and wanted to be carried all the time. *Id.*

Petitioners took I.P. to the hospital on November 27, 2015, because she had a fever, chills, and a limp. Pryor Aff. at 1. Her limp had been ongoing for a few days, and on November 27, 2015, she had fallen and hurt her knee. *Id.* The hospital took x-rays and determined that I.P.'s inflammation in her knees was related to a virus. *Id.*

I.P. was taken to urgent care on December 30, 2015 because of her continued limp. Pryor Aff. at 2. I.P. had inflammation in her right femur, and Mrs. Pryor was given instructions to take her to the PCH ED. *Id.* There, I.P. was diagnosed with osteomyelitis of the right femur, after x-rays and an examination. *Id.*

I.P. was in a lot of pain during her hospital admission and was very fearful of needles, making it difficult to keep an IV line in during administration of the antibiotics. Pryor Aff. at 2. After I.P. was discharged on January 5, 2016, she had to continue oral antibiotics and get biweekly blood work. *Id.*

Mrs. Pryor said that I.P. is in pain daily, still has difficulty standing for semi-long periods of time, and has "turned from [an] adventurous, outgoing healthy child to crying, very cautious, [and] playing by herself." Pryor Aff. at 3.

**C. Mrs. Pryor's Testimony**

At the entitlement hearing, Mrs. Pyror testified that prior to the September 10, 2015 vaccinations, I.P. was adventurous and caring. Tr. at 5. She never experienced any significant illnesses, though she was occasionally sick with minor infections. *Id.* at 5, 34. Six to eight weeks after the vaccinations, I.P. was a "very, very different toddler," became "very temperamental," and would "cry, [and] was very clingy." *Id.* at 7-8. She always wanted to be carried and had "fevers and chills," and she walked with a limp. *Id.* at 7. Mrs. Pryor believed I.P.'s symptoms were behavioral and not medical, so she did not pursue treatment at that time. *Id.* at 8.

On November 27, 2015, Mrs. Pryor took I.P. to the hospital because she was "presenting the symptoms of fever, chills, always crying, very clingy, and a limp with her leg." Tr. at 9. Mrs. Pryor clarified that she did not personally see whether a bowling ball dropped on I.P.'s foot or whether she fell, but "those were the only logical explanations I could think about because I didn't see it happen… I was trying to figure out why is my daughter crying." *Id.* at 10.

When asked about I.P.'s condition prior to November 27, 2017, Mrs. Pryor testified that I.P was crying a lot because she was nonverbal and as a mom, she was trying to put context clues together regarding the bowling incident and the bed incident to explain why I.P. was so upset. Tr. at 12-13. I.P. had a fever, chills, and was walking funny, which prompted the trip to the ER on November 27, 2015. *Id.* at 12.

Between November 27 and December 30, 2015, Mrs. Pryor would give I.P. ibuprofen/Motrin, and I.P. "would feel good," but then she would develop a fever and chills and

become clingy. Tr. at 14. This occurred every three days. *Id.* I.P. was diagnosed with subacute osteomyelitis of the right femoral neck at the December 30, 2015 ER visit. *Id.* at 17.

Mrs. Pryor took I.P. to the pediatrician on February 23, 2016, because I.P. was limping again and had a cough and fever. Tr. at 19-20. Mrs. Pryor stated that I.P.'s symptoms at this point had worsened. *Id.* at 20. When I.P. was taken to the orthopedist on March 4, 2016, she was "having a good day" and did not have a fever that correlated with her limp. *Id.*

Throughout 2016, I.P. would get fevers, chills, and right leg pain. Tr. at 22. Mrs. Pryor would give Motrin to bring the fever down. *Id.* Mrs. Pryor testified that the medical record from December 5, 2016, accurately described how I.P. was experiencing a fever every three days. *Id.* at 23. When I.P. had a fever, her right leg would feel warm to touch and would look blotchy. *Id.* at 23-24.

Mrs. Pryor would treat I.P.'s right leg pain with ointments, leg massages, and hot showers. Tr. at 25-26. She added that I.P. still experienced daily pain to this day and could not stand for long periods of time. *Id.* at 27-28.

During cross examination, Mrs. Pryor agreed that I.P. had a number of prior infections and stated that I.P. did not have any "immediate reactions" to the subject vaccinations, including redness or swelling at the vaccination sites. Tr. at 35-36, 46. I.P.'s limping began in December 2015, and she experienced fevers during that month as well. *Id.* at 37. She acknowledged that in February 2016, when I.P.'s condition appeared to worsen, I.P. tested positive for a strep infection. *Id.* at 47.

## III. EXPERT EVIDENCE

### A. Expert Reports

#### 1. Petitioners' Expert: Thomas M. Zizic, M.D.

Petitioner filed two expert reports from Dr. Zizic. Ex. 6 ("First Zizic Rep."); Ex. 25 ("Second Zizic Rep."). Dr. Zizic received his M.D. from Johns Hopkins University ("JHU") School of Medicine. Ex. 6 at 1; *see also* Ex. 7 ("Zizic CV"). He completed his internship and residency at JHU Hospital, then took a role on the faculty in 1971. Zizic CV at 2. He was serving as an Associate Professor of Medicine at JHU at the time his CV was filed. *Id.* He is licensed to practice medicine in Maryland and specializes in rheumatology. *Id.* He has served on numerous boards in the field of rheumatology. *Id.* at 5. He has authored or co-authored more than 50 articles in the field of rheumatology. *Id.* at 7-11.

In his first report, Dr. Zizic opined that I.P. developed chronic recurrent multifocal osteomyelitis ("CRMO"), also known as chronic nonbacterial osteomyelitis ("CNO").[8] First Zizic

[8] The record indicated that the more modern term for chronic recurrent multifocal osteomyelitis is chronic nonbacterial osteomyelitis, though the terms can be used interchangeably. First Gans Rep. at 9. For ease, this Decision will refer to the condition as "CNO."

Rep. at 28. CNO "is a non-infectious inflammatory disorder of yet to be determined etiopathology" that most commonly affects children and adolescents. *Id.* at 25 (citing Polly J. Ferguson, *Current Understanding of the Pathogenesis and Management of Chronic Recurrent Multifocal Osteomyelitis,* 14 CURR RHEUMATOL. REP (2012) (Ex. 11) ("*Ferguson*")). Dr. Zizic explained:

> Symptoms and disease onset can be mild with bone pain with or without local swelling and warmth, or acute with more severe pain, malaise, fevers and even fractures. A subset of patients develop[] chronic disease with ongoing inflammation over years and may suffer from sequelae, such as vertebral fractures and gibbus formation. Bone lesions can occur at any site of the skeleton except for the neural cranium. Additional organs can be involved, including the skin, the eyes, the gastrointestinal system, and the lungs. Skin inflammation can manifest palmoplantar pustulosis, psoriasis, and occasionally as pyoderma gangrenosum. Sporadic CNO/CRMO is a diagnosis of exclusion, since the clinical presentation and laboratory findings are not disease-specific and vary between affected individuals.

*Id.* at 25.

Dr. Zizic pointed out that although CNO was in I.P.'s differential throughout her medical course, no bone biopsy was done to confirm the diagnosis. First Zizic Rep. at 28. Nonetheless, in his view, her presentation and course were consistent with CNO. *Id.*

CNO is an autoinflammatory disease characterized by recurrent episodes of sterile inflammatory lesions in the bones. First Zizic Rep. at 23-24. Autoinflammatory diseases "arise through inappropriate activation of antigen-independent inflammatory mechanisms." *Id.* at 23. As such, they are considered diseases of innate immunity, although "cells more typically associated with adaptive immunity ([e.g.,] lymphocytes) may also contribute to autoinflammation." *Id.* Innate immunity "refers to a network of cells and proteins that respond to infection or tissue injury through genetically 'hard-wired' recognition for molecules (e.g., bacterial cell wall components) or molecules reduced or released by damaged cells (e.g., interleukin–1 [IL–1] and uric acid crystals)." *Id.* at 22. These cells include neutrophils, macrophages, and dendritic and natural killer cells, as well as the complement system and pro-inflammatory signaling proteins. *Id.* (citing Donato Rigante et al., *The hereditary autoinflammatory disorders uncovered*. AUTOIMMUNITY REVIEWS. 13:892-900, 2014) (Ex. 8) ("*Rigante*"). Inflammasomes may also play a role. *Id.* at 24 (citing P.I. Sidiropoulos et al., *Inflammasomes and rheumatic diseases: evolving concepts.* ANNALS OF RHEUMATIC DISEASES 67:1382–1389, 2008 (Ex. 16) ("*Sidiropoulos*")). Autoinflammatory diseases like CNO typically respond favorably to treatments focused on cytokine antagonism. *Id.* at 23 (citing Sinisa Savic et al., *Autoinflammatory syndromes and cellular responses to stress: pathophysiology, diagnosis and treatment perspectives*. BEST PRACTICE AND RESEARCH CLINICAL RHEUMATOLOGY 26:505- 533, 2012 (Ex. 10) ("*Savic*")).

Dr. Zizic explained that "[a]utoinflammatory bone disorders are the result of a disturbed regulation of the innate immune system, resulting in immune cell infiltration of the bone and subsequent osteoclast differentiation and activation, osteoporosis and bone remodeling." First Zizic Rep. at 25 (citing Christian Hedrich et al., *Autoinflammatory bone disorders with special focus on chronic recurrent multifocal osteomyelitis (CRMO)*. PEDIATRIC RHEUMATOLOGY, 11:47-56 (2013) (Ex. 17) ("*Hedrich*")). This disturbance might result from gene mutations that affect the "normal physiological death and clearance processes" of cells, "or by environmental pathogens or toxins that cause cellular stress or death." *Id.* at 26 (citing Polly Matzinger, *The Danger model: a renewed sense of self.* 296 SCIENCE 301-305 (2002) (Ex. 20) ("*Matzinger*")). These factors could produce danger signals that elicit an inflammatory response. *Id.* The pathophysiology of CNO involves an imbalance between pro-inflammatory and anti-inflammatory cytokines. First Zizic Rep. at 25-26 (citing S.R. Hofmann et al., *Chronic non-bacterial osteomyelitis is associated with impaired SP1 signaling, reduced IL-10 promoter phosphorylation, and reduced myeloid IL-10 expression*. 141 CLINICAL IMMUNOLOGY 317-327 (2011) (Ex. 18) ("*Hofmann*")).

CNO can be associated with certain genetic conditions, including interleukin-1 ("IL-1") receptor antagonist deficiency ("DIRA"), suggesting that IL-1 "may be a key cytokine in disease pathogenesis." First Zizic Rep. at 24. One study found a susceptibility locus for CNO on human chromosome 18q21.3-18q22. *Id.* (citing Astrid Golla et al., *Chronic Recurrent Multifocal Osteomyelitis (CRMO): Evidence for a Susceptibility Gene Located on Chromosome 18q21.3-18q22*, 10 EURO. J. HUM. GEN. 217-221 (2002) (Ex. 15) ("*Golla*")). Additionally, certain large dog breeds develop canine hypertrophic osteodystrophy ("HOD"), which has features similar to CNO. *Id.* (citing *Ferguson*). HOD is "often triggered by vaccination and clusters in litters, suggesting a single gene defect." *Id.* (citing V. Abeles et al., *Hypertrophic osteodystrophy in six Weimaraner puppies associated with systemic signs*. 145 THE VETERINARY RECORD 130–134 (1999) (Ex. 12) ("*Abeles*"); S. Harrus et al., *Development of Hypertrophic osteodystrophy and antibody response in a litter of vaccinated Weimaraner puppies*. 43 JOURNAL OF SMALL ANIMAL PRACTICE 27-31 (2002) (Ex. 13) ("*Harrus*"); J.C. Woodard, *Canine hypertrophic osteodystrophy, a study of the spontaneous disease in littermates*. 19 VETERINARY PATHOLOGY 337–354, (1982) (Ex. 14) ("*Woodard*")).

Dr. Zizic proposed that in the "right genetic host," a vaccine could plausibly cause an autoinflammatory disease like CNO. First Zizic Rep. at 24. He pointed out that another autoinflammatory syndrome, hyperimmunoglobulinemia D with periodic fever syndrome ("HIDS"), is characterized by "attacks that are typically precipitated by vaccination, infection or physical and emotional distress." *Id.* at 27 (citing *Savic*; Jeroen C. H. van der Hilst et al., *Long-term follow-up, clinical features, and quality of life in a series of 103 patients with hyper-immunoglobulin D syndrome*. 87 MEDICINE 301-310 (2008) (Ex. 22) ("*van der Hilst*")). He referenced a case report in which a two-year-old boy was diagnosed with CNO with granulomatous pyoderma following routine vaccinations. *Id.* (citing Neslihan Karaca et al., *Granulomatous powder in the preceding chronic recurrent multifocal osteomyelitis triggered by vaccinations in a two- year-old boy: a case report*. 4 JOURNAL OF MED. CASE REPS. 25-29 (2010) (Ex. 23) ("*Karaca*")). He suggested that a vaccinated individual's genetic susceptibility to dysregulation of IL-10 expression might cause "secretion of various cytokines in the early inflammatory response of the innate immune system, [and] may produce an environment similar to that of exogenous adjuvants." *Id.* at 28 (citing *Hofmann*).

Lastly, Dr. Zizic opined that I.P.'s development of symptoms six to eight weeks following vaccination with multiple vaccines was an appropriate temporal pattern for a vaccination-induced reaction. First Zizic Rep. at 28.

2. Respondent's Expert: Haley Gans, M.D.

Respondent submitted two expert reports from Dr. Gans. Ex. A ("First Gans Rep."); Ex. L ("Second Gans Rep."). Dr. Gans received her M.D. from the SUNY Health Science Center at Syracuse. Ex. B ("Gans CV") at 1. She completed her residency in pediatrics and fellowship in pediatric infectious diseases at Stanford University School of Medicine. Gans CV at 1. She is board certified in pediatrics and pediatric infectious disease and is a clinical professor in the Department of Pediatrics at Stanford University Medical School. *Id.* at 1-2. Her research focuses on pediatric immune responses to different viral infections, vaccines, and transplants. *Id*. at 2. She is an active member of academic committees at Stanford School of Medicine and of several national medical organizations. *Id.* at 3-4. She has authored or co-authored 30 articles focused on pediatric diseases, treatments, and immunology. *Id.* at 5-7. She has treated hundreds of children with CNO, bacterial osteomyelitis, and primary immunodeficiencies. First Gans Rep. at 1.

Dr. Gans disagreed with Dr. Zizic's opinion that I.P. developed CNO. First Gans Rep. at 2. Instead, she opined I.P. more likely had bacterial osteomyelitis that was unrelated to her vaccinations. *Id.* She stated that I.P. had no findings consistent with a CNO diagnosis, "except for a history of recurrent pain." *Id.* at 9.

Dr. Gans acknowledged that CNO was included on I.P.'s differential diagnosis as a possible diagnosis. First Gans Rep. at 9. CNO is an autoinflammatory bone disease characterized by sterile bone lesions. *Id.* It predominates in females, with a peak incidence at 10 years of age. *Id.* It presents with pain as a consistent feature, "usually with an insidious onset, and is associated with swelling and tenderness over the affected bones." *Id.* at 9-10. CNO has overlapping features with bacterial osteomyelitis, including osteolysis, sclerosis, and new bone formation. *Id.* at 10. Fever and unifocal disease are infrequent. *Id.* (citing Wipff, J., et al., *A large national cohort of French patients with chronic recurrent multifocal osteitis.* ARTHRITIS RHEUMATOL. Apr 2015;67(4):1128-1137 (Ex. D) ("*Wipff*")). Active disease can be measured by assessing inflammatory markers, symptoms, and findings on physical exam. *Id.* (citing *Roderick*).

Because CNO is not infectious, it can be distinguished from bacterial osteomyelitis by reference to the patient's response to antibiotics. First Gans Rep. at 10 (citing *Wipff*). Dr. Gans noted that I.P. responded "exceedingly well" to the course of antibiotics she received, pulling against CNO as the diagnosis. *Id.*

Dr. Gans noted that some of I.P.'s symptoms were consistent with CNO, including a bone lesion seen on MRI with associated inflammation "evidenced by elevated inflammatory markers and recurrent pain." First Gans Rep. at 10. Further, it is possible that I.P.'s recurring pain could have been caused in part by CNO-related non-inflammatory bone pain. *Id.* However, Dr. Gans felt CNO was unlikely because the remainder of I.P.'s clinical course was inconsistent with the diagnosis. *Id.* Most importantly, she recovered with antibiotics and had complete resolution of

her lesion. *Id.* at 10-11. She had no recurrent lesions, even during episodes of reported leg pain and fever. *Id.* at 11. She had no abnormal physical exams, radiographic abnormalities, or elevated inflammatory markers associated with those episodes. *Id.* at 11.

Like CNO, bacterial osteomyelitis is common in children, with most cases in children younger than five years of age. First Gans Rep. at 11.

> Typical symptoms include fever, bone pain, reduced mobility, and laboratory values that suggest inflammation with elevated WBC and inflammatory markers. Radiographic findings show areas of inflammation, and the femur and tibia are common sites of infection. Gram positive bacteria predominate, such as *Staphylococcus aureu*s, but there is a growing appreciation for other organisms, such as *Kingella kingae*, especially in young children and associated with recent viral URI.

*Id.* (citing J. Dartnell et al., *Haematogenous acute and subacute paediatricosteomyelitis: a systematic review of the literature*. J BONE JOINT SURG BR. May 2012;94(5):584-595 (Ex. G) ("*Dartnell*"); Pablo Yagupsky et al., *Kingella kingae: an emerging pathogen in young children.* PEDIATRICS Mar 2011;127(3):557-565 (Ex. H) *("Yagupsky*")). Osteomyelitis caused by *K. kingae* presents in a more subacute fashion, with little or no fever and only slightly elevated inflammatory markers. *Id.* Furthermore, blood cultures are negative in more than 50% of children with osteomyelitis; this number is even higher in patients infected by *K. kingae*. *Id.* (citing *Yagupsky,* J. Chase McNeil et al., *Role of Operative or Interventional Radiology-Guided Cultures for Osteomyelitis*. PEDIATRICS May 2016;137(5) (Ex. I) *("McNeil*")). Patients with bacterial osteomyelitis promptly respond to antimicrobial therapy. *Id.* Dr. Gans opined that I.P.'s course "matche[d] all of the features seen with infections caused by *K. kingae*; specifically, preceding viral illness, the subacute nature of disease, the lack of fever at the time of diagnosis and mildly elevated inflammatory markers." *Id.* She quickly responded to antibiotic treatment. *Id.*

Regarding causation of CNO, Dr. Gans noted that the disease is thought to result from immune dysregulation, shown as cytokine abnormalities found in the blood of affected individuals. First Gans Rep. at 10 (citing M.R. Roderick et al., *Chronic recurrent multifocal osteomyelitis in children and adults: current understanding and areas for development.* RHEUMATOLOGY (OXFORD) Jan 1 2018;57(1):41-48 (Ex. N) ("*Roderick*")). Animal data suggest that the intestinal microbiome and diet might also play a role in triggering the disease. *Id.* (citing John Lukens et al., *Dietary modulation of the microbiome affects autoinflammatory disease*. NATURE, Dec. 11 2014;516(7530):246-249 (Ex. Q) ("*Lukens*")).

Dr. Gans opined that Dr. Zizic had failed to tie the subject vaccinations to I.P.'s condition. First Gans Rep. at 12. The single case report cited by Dr. Zizic involved development of CNO many months after vaccination. *Id.* Also, Dr. Zizic's theory centered on the innate immune system response, which occurs immediately after exposure. *Id.* The cytokines produced in the response "have an extremely short half-life, on the magnitude of hours." *Id.* (citing Daria Hazuda et al., *The kinetics of interleukin 1 secretion from activated monocytes. Differences between interleukin 1 alpha and interleukin 1 beta.* J BIOL CHEM. Jun 15 1988;263(17):8473-8479 (Ex. J) ("*Hazuda*")).

Thus, the innate immune response would not cause adverse events months later. *Id.* Additionally, I.P. did not evidence any symptoms indicative of a pathogenic innate immune response, such as local swelling, fever, or redness, in the days after receiving the subject vaccinations. *Id.* "Thus, her innate immune response was not abundant [after vaccination]." *Id.*

3. Dr. Zizic's Second Expert Report

Dr. Zizic maintained that the appropriate diagnosis for I.P. was CNO. Second Zizic Rep. at 1. He pointed out that there are no diagnostic criteria for CNO, and the diagnosis is one of exclusion. *Id.* (citing *Roderick*). Regarding Dr. Gans's contention that I.P.'s course was more consistent with bacterial osteomyelitis than with CNO, Dr. Zizic stated:

> The discharge summary from the 12/31/2015 to 1/04/2016 admission indicates that after discharge [I.P.] was treated with both Keflex and Motrin. Despite negative blood cultures, Dr. Gans believes that [I.P.'s] response to Keflex somehow proves that [I.P.] had bacterial osteomyelitis. Dr. Gans apparently totally disregards the fact that giving her Motrin is prescribing preferential first-line therapy for CRMO/CNO. In fact[,] from the same review article by Dr. Roderick relied on by Dr. Gans: "NSAIDs are usually considered first-line treatment and may be very effective, producing a clinical and radiological improvement in many patients. It is postulated that NSAIDs act by inhibition of the cyclooxygenase pathway, thereby inhibiting prostaglandin synthesis. A review compiling case reports found that overall 79% of patients had a good response to a variety of NSAIDs."

*Id.* at 2 (quoting *Roderick*).

I.P.'s recurring episodes of pain were, in Dr. Zizic's view, incompatible with a bacterial infection. Second Zizic Rep. at 2. The fact that she continued to be free of lesions on imaging did not rule out CNO; the *Beck* study showed that radiologic lesions resolved with one year of treatment with anti-inflammatory medications. *Id.* (citing Christine Beck et al., *Chronic non-bacterial osteomyelitis in childhood: prospective follow-up during the first year of anti-inflammatory treatment.* ARTHRITIS RESEARCH AND THERAPY 12:R74 (2010) (Ex. 27) ("*Beck*")). The type of lesion I.P. had was consistent with CNO, as were her recurrent fevers, which are common in autoinflammatory diseases. *Id.* (citing *Ferguson*, Peter Nigrovic et al., *Periodic fever syndromes and other auto inflammatory diseases: an overview.* UpToDate, 4/23/2018 (Ex. 26) ("*Nigrovic*")). Also, it is not uncommon for children to CNO to have normal findings on physical exam, as I.P. did. *Id.* at 3 (citing *Ferguson*). Her CRP levels over time were also consistent with CNO. *Id.* Finally, I.P.'s treating rheumatologist, Dr. Shishov, believed the most likely diagnosis was CNO. *Id.* at 4.

Regarding causation, Dr. Zizic pointed out that the IL-1 cytokine has a longer half-life than other cytokines. Second Zizic Rep. at 4 (citing *Hazuda*). Moreover, the literature cited by Dr. Gans does not suggest that a cytokine-driven pathogenic response could not occur outside the half-

life of the responsible cytokine: "The important parameter is not how long those enzymes that trigger the process are present but the duration of the subsequent auto-inflammatory response those cytokines have caused." *Id.* (citing Tetsuo Nakayama, *Causal relationship between immunological responses and adverse reactions following vaccination*. VACCINE Jan 7 2019;37(2):366-371 (Ex. K) ("*Nakayama*")).

4. Dr. Gans's Second Expert Report

In response to Dr. Zizic, Dr. Gans stated: "My previous report outlined how [I.P.'s] condition does not meet the diagnostic criteria for CNO/CRMO, but more importantly, neither the literature nor Dr. Zizic's report provide a plausible biologic link specifically with [I.P.'s] vaccine and her subsequent condition." Second Gans Rep. at 1. She pointed out that there are published diagnostic criteria for CNO, which I.P. did not meet. *Id.* at 1-2 (citing A Jansson et al., *Classification of non-bacterial osteitis: retrospective study of clinical, immunological and genetic aspects in 89 patients.* RHEUMATOLOGY (OXFORD) 2007;46(1):154-160 (Ex. M) ("*Jansson*")).

Contrary to Dr. Zizic's claim, I.P. was not on continuous ibuprofen for her condition, "especially at levels consistent with treatment for CNO." Second Gans Rep. at 2. By contrast, her response to antibiotics was rapid, a fact that itself rules out CNO. *Id.* at 3. Also, because her initial lesion was unifocal, the CNO diagnosis would require involvement of the clavicle, which I.P. did not have. *Id.*

With respect to Dr. Shishov's assessment, Dr. Gans noted that he did not "rule in" CNO for I.P. and did not recommend any follow-up visits, "which would be unusual for a true CNO case." Second Gans Rep. at 3.

On causation, Dr. Gans pointed out that there is no literature suggesting CNO may be vaccine-caused. Second Gans Rep. at 4. She stated that there is a "strong genetic basis for the disease, and in addition, recent findings show that homeostasis is disrupted by changes in the microbiome that favor inflammation, leading to CNO." *Id.* (citing *Ferguson, Lukens*). She concluded:

> The pathophysiology of CNO, if that is the diagnosis (albeit not supported), is not under debate, rather the inciting event for CNO in general and in particular how [I.P.'s] vaccines can cause osteomyelitis [three] months later and years of leg pain. Dr. Zizic's reports do not provide a specific and reasonable link. In contrast, my previous and the current report show data on the theory of homeostatic immune dysregulation related to intestinal microbiome causing CNO and thus, this condition is unrelated to external factors, such as infections and vaccines.

*Id.* at 5.

**B. Expert Testimony**

1. Dr. Zizic's Testimony

Dr. Zizic was recognized as an expert in rheumatology and immunology. Tr. at 61. He concluded that I.P. developed CNO. *Id.* at 64-65. He opined that the vaccines I.P. received on September 10, 2015, caused an inflammatory cytokine response, resulting in CNO. *Id.* at 94, 98, 104.

According to Dr. Zizic, I.P. had no history of symptoms suggestive of an autoinflammatory disease prior to her vaccinations. Tr. at 66. The childhood infections she had before the vaccinations were "irrelevant." *Id.* Her post-vaccination condition was not consistent with bacterial osteomyelitis. *Id.*

Dr. Zizic testified that CNO typically affects children, adolescents, and sometimes adults. Tr. at 70. Referring to *Ferguson*, he stated that CNO's typical presentation includes an insidious onset of bone pain, with or without fever. *Id*. at 87. Laboratory studies typically reveal nonspecific evidence of inflammation, which can include a normal white blood cell count but an elevated CRP. *Id*. at 70. Local trauma would not cause a systemic elevation of CRP, because not enough IL-6 is triggered from routine trauma. *Id.* at 89. Pain can be relapsing and remitting, and it can recur at the same site or a different one. *Id.* at 71.

Dr. Zizic testified that the left leg/knee symptoms I.P. was experiencing on November 27, 2015, when she first presented to the ER, were part of the same disease process as her later right knee symptoms. Tr. at 72-73. That was when I.P.'s disease became clinically relevant. *See id.* at 175. That day, she had a fever of 103 degrees, a normal white blood cell count, and a CRP level seven times normal, evidencing a systemic inflammatory response consistent with CNO. *Id.* at 73-74, 119-20. Her x-ray showed extensive soft tissue swelling. Tr. at 122. Dr. Zizic explained that a small knee joint effusion could be seen in either bacterial osteomyelitis or CNO, but given I.P.'s normal white blood cell count, high fever, and high CRP, CNO was more likely. *Id*. at 123-24. Trauma would not cause the elevation in CRP. *Id.* at 74.

By December 30, 2015, when I.P. was taken back to urgent care, the x-ray demonstrated a local area of lucency of the proximal right femoral neck. Tr. at 131. Dr. Zizic stated that "the fact that there is this hole in the bone and sclerosis around it is classical for nonbacterial or sterile osteomyelitis." *Id.* By contrast, with bacterial osteomyelitis, the imaging would have shown "some lucency where the bone is being reabsorbed by the osteoclasts, and then you have some sclerosis where the osteoblasts are making new bone." *Id.* at 131-32.

Aside from her imaging and lab results, I.P.'s symptoms were "not compatible with [bacterial osteomyelitis] on [the left] side, spreading to the [right] side, with it being normal four weeks in between…. But we know [CNO] can do this kind of thing by itself and certainly can do this kind of thing by itself… [and] with some added help from Motrin." Tr. at 117. "[T]he fact that the left side gets better and the right side gets dramatically worse with holes in the bone" is "inconsistent with bacterial [osteomyelitis] and very consistent with nonbacterial [osteomyelitis]." *Id.* at 125-26.

Likewise, the treatment course I.P. received was consistent with CNO and not bacterial osteomyelitis. Tr. at 109. The *Beck* article commented that NSAIDs have been recommended as a first-line therapy for CNO. *Id*. at 105-06 (citing *Beck* at 2). NSAIDs inhibit prostaglandin, which is responsible for damaging the bone and causing edema in CNO. *Id*. at 107. Dr. Zizic testified that in his practice he routinely treats CNO with NSAIDs. *Id.* at 109. He disagreed with Dr. Gans's opinion that I.P. improved on antibiotics, noting that she was concurrently being treated with ibuprofen, making it impossible to determine which treatment was effective. *Id*. at 133.

In February 2016, I.P. experienced a CNO flare. Tr. at 136. Her labs showed I.P. had a normal white blood cell count and a normal neutrophil count, but her CRP was significantly elevated. *Id*. at 137-38. Even though her x-ray appeared normal, she still had a limp and pain. *Id*. at 139. To Dr. Zizic, these signs and symptoms demonstrated active systemic inflammation from nonbacterial osteomyelitis. *Id*. at 140. I.P.'s later records, including her appointment with rheumatologist Dr. Shishov, were also consistent with CNO. *Id*. at 142-44. She was experiencing stiffness in the morning, consistent with the symptoms described in *Beck*. *Id.* at 144.

Dr. Zizic testified that even applying the diagnostic criteria proposed by Dr. Gans, CNO would be the appropriate diagnosis. Tr. at 147-50. I.P. had "radiologically proven osteolytic bone lesion," meeting a major criterion; her CRP levels were elevated; the observation time was longer than six months; she had normal blood counts and was relatively healthy; and Mrs. Pryor has Hashimoto's thyroiditis, an autoimmune condition. *Id.* at 148-49. All told, I.P. met one major and four minor criteria as proposed in *Jansson*, satisfying the diagnosis for CNO. On cross-examination, Dr. Zizic conceded that an elevated CRP could also occur in bacterial osteomyelitis. *Id.* at 168.

Dr. Zizic stated that the exact pathophysiology for CNO is unknown, but it is thought to involve an imbalance between pro-inflammatory and anti-inflammatory cytokines. Tr. at 95-97 (citing *Hendrich* at 4; *Hofmann* at 2). This imbalance produces a cascade effect in which IL-6, TNF-α, and IL-1 are activated and damage cells, which in turn release more imbalanced cytokines, resulting in chronic disease. *Id*. at 93-98. Dr. Zizic opined that the subject vaccines triggered inflammatory cytokines with insufficient anti-inflammatory cytokines to inhibit them, causing I.P.'s bone damage. *Id*. at 93.

Dr. Zizic argued the literature demonstrates that vaccines can trigger autoinflammatory diseases, such as CNO. Tr. at 99, 101. The *van der Hilst* article examined the clinical course of patients with HIDS, another autoinflammatory condition, and reported that 63% of patients felt that childhood vaccines induced the first attack. *Id*. at 98-99 (citing *van der Hilst* at 3). Another study demonstrated that vaccinations could trigger canine hypertrophic osteodystrophy in dogs, which is similar to human CRMO. *Id*. at 100-01. The *Karaca* case report, which described recurrent multifocal osteomyelitis occurring in a two-year old patient, also supported the theory that vaccines can induce CNO and involved two of the same vaccines that I.P. received. *Id.* at 102-03.

With respect to *Althen* prong three, Dr. Zizic testified that I.P.'s presentation to the ER on November 27, 2015, approximately eight to ten weeks post-vaccination, was an acceptable

timeframe for development of CNO following vaccination. Tr. at 112. CNO is insidious and can have a very slow onset. *Id.* Dr. Zizic opined that I.P.'s condition likely began "sometime in the month before—after vaccination that things started." *Id.* at 113. He testified that "by looking at the other leg," he could gauge onset of the disease:

> The [right leg] is asymptomatic. And then around six, seven weeks later, from November 27th to December 31st, a little over four weeks, five weeks, let's say, she's got a hole in her bone. So [the left side] is going on and not yet with bone lesions you can see on x-ray. So extrapolating from that, I would look back and say sometime around a month earlier is when it began on the left side…. So October 27th or something like that…. I'm just trying to do the best I can to give you an answer that I can justify, I mean that I can support.

*Id*. at 114.

During cross-examination, Dr. Zizic explained that his onset opinion was based on the fact that CNO is a slow-developing process. Tr. at 183. He agreed, however, that there is no way to determine precisely when I.P.'s disease first began; it could have been "weeks to months" after vaccination. *Id*. at 185. He believed the clinical manifestation of I.P.'s CNO was a few days prior to her November 27, 2015, ER visit. *Id.*

On rebuttal, Dr. Zizic opined that it was likely I.P. had a bone lesion on November 27, 2015, that was not detected on x-ray and was responsible for the inflammation that caused the soft tissue swelling in I.P.'s left knee. Tr. at 351.

2. <u>Dr. Gans's Testimony</u>

Dr. Gans was recognized as an expert in pediatrics and pediatric infectious diseases. Tr. at 233. Consistent with her expert reports, she opined that I.P. did not have CNO. *Id*. at 235. Her opinion was that I.P. developed bacterial osteomyelitis in December 2015, and the other symptom flares I.P. experienced were not bacterial osteomyelitis. *Id*. at 307.

CNO is a "very hard diagnosis to make . . . because there's no definitive diagnosis." *Id*. at 248. Many of the symptoms, like pain, are non-specific. *Id.* at 248, 261. As such, the diagnostic criteria are imperfect, but they are still helpful for the clinician. *Id.* at 248. Imaging is the "hallmark" tool for diagnosing the disease. *Id.* at 249. Also, white blood cell count, CRP, and erythrocyte sedimentation rate[9] ("ESR") are measured, but these values are nonspecific. *Id.* at

[9] Erythrocyte sedimentation rate: the rate at which erythrocytes precipitate out from a well-mixed specimen of venous blood, measured by the distance the top of the column of erythrocytes falls in a given time interval under specified conditions; an increase in rate is usually due to elevated levels of plasma proteins, especially fibrinogen and immunoglobulins, which decrease the zeta potential on erythrocytes by dielectric shielding and thus promote rouleau formation. It is increased in monoclonal gammopathy, hypergammaglobulinemia due to inflammatory disease, hyperfibrinogenemia, active inflammatory disease, and anemia. *Erythrocyte sedimentation rate*, DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=102146 (last accessed July 9, 2026).

251. Generally, mild elevation of ESR and CRP are seen; if values are more than double the norm, the clinician will begin to look for other diagnoses. *Id.* A patient responding to antibiotics is not indicative of CNO, as that is not an infectious condition. *Id.* at 260. However, as Dr. Zizic stated, when a patient is receiving multiple therapeutics, it can be difficult to determine which treatment has been effective. *Id.* at 260-61.

I.P. had "clinical features in her history that could be consistent with CNO and there's things in her clinical history that are completely inconsistent with CNO." Tr. at 241. She had chronic leg pain that was undiagnosed, along with one documented episode of acute bacterial osteomyelitis. *Id*. She had a number of typical childhood infectious illnesses prior to the subject vaccinations. *Id.* at 235. When she was hospitalized in December 2015, she met the criteria for subacute osteomyelitis, one of the most common infections seen in children. *Id.* at 236-37. She responded quickly to IV antibiotic treatment for that infection. *Id.* at 237. She was also given ibuprofen for pain, as is typical. *Id.* at 237.

Dr. Gans did not believe I.P.'s episode of leg pain in November 2015, nor her symptoms in February 2016, were indicative of osteomyelitis. Tr. at 238. In February 2016, she was positive for RSV and strep, and she had no bone abnormalities on imaging. *Id.* at 238-39. She was seen by a rheumatologist, but she did not have a full workup for CNO. *Id.* at 239.

Dr. Gans concurred with Dr. Zizic that CNO is an autoinflammatory disease rather than an autoimmune process. Tr. at 242. CNO can affect multiple sites and lead to the development of multiple lesions over time. *Id.* at 243. Clinically, CNO manifests with deep, bony pain and mild swelling, but no significant soft tissue swelling. *Id.* at 244-45. On exam, the patient will have tenderness to palpation. *Id.* at 245. They may or may not have fever, and their inflammatory markers might be very mildly elevated, if at all. *Id.*

Dr. Gans opined that a chronic condition like CNO would not be incited by a single exogenous trigger like a vaccination. Tr. at 241. Rather, endogenous causes are more likely to be responsible, such as an individual's microbiome. *Id.* at 241-42. Chronic illnesses will probably have a "chronic inciting event." *Id.* at 264. Furthermore, while some cytokines promote inflammation, they have a "very short half-life." *Id*. Also, the immune system is "very redundant" and will compensate for deficiencies in anti-inflammatory cytokines. *Id.* at 265.

Bacterial osteomyelitis is a common childhood bone infection. Tr. at 265. It can be triggered by a trauma that can promote bacterial growth in children's bones, which have a high level of vasculature. *Id.* at 265. Clinically, the child will often complain of pain, experience mobility problems, or refuse to move the affected limb. *Id.* at 267. They might also have fever and sometimes high white blood cell counts, high CRP levels, and elevated ESR. *Id.* at 267-68. Bacterial osteomyelitis most commonly occurs in the femur or tibia, but it can occur in any bone. *Id.* at 268.

Dr. Gans explained that only about 50% of blood cultures in patients with suspected bacterial osteomyelitis will be positive. Tr. at 269-70. Some bacteria do not grow in culture but might be detected with PCR testing. *Id.* at 270. Regardless of culture results, antibiotics are given as a first-line therapy for suspected bacterial osteomyelitis. *Id.* Intravenous antibiotics are given

initially, followed by oral antibiotics, for an overall treatment course of four to six weeks. *Id.* at 271-72. Although the clinical symptoms will improve during that time, it might take longer for the bone to heal. *Id.* at 273. Four to six weeks is the suggested treatment timeframe because treatment for less than three weeks could lead to recurrence or persistent symptoms. *Id.* at 273.

When I.P. presented to the ER on November 27, 2015, she had been limping for a couple of days on the left leg. Tr. at 274. Dr. Gans felt the most likely explanation was that she had a traumatic injury affecting that leg, based on the amount of soft tissue swelling and bruising that was observed, the imaging, and the history provided by I.P.'s parents. *Id.* at 275-76. There was no evidence of osteomyelitis at that time. *Id.* at 276. I.P. was, however, suffering from a URI, which would not be unusual in a child her age. *Id.* That infection explained her elevated CRP at the time, which was too high to be consistent with CNO. *Id.* at 279, 281.

Dr. Gans reiterated that I.P.'s response to treatment in December 2015 was consistent with subacute bacterial osteomyelitis. Tr. at 287. When she next presented with complaints of leg pain and fever in February 2016, she also had a "clear respiratory illness" and tested positive for RSV and Group A strep. *Id.* at 288. She had elevated CRP, but again, it was too high to be consistent with CNO. *Id.* at 289.

Dr. Gans noted that I.P. did not receive a specific diagnosis associated with her recurring leg pain in the months following the February 2016 visit. Tr. at 293. She testified:

> What I see . . . is this consistent complaint by the mom without any physician who has been able to say that there's any findings on an exam that would push them to make any kind of diagnosis, even if it's recurrent leg pain, which can happen for many reasons, vascular, all these other ways in which you would probably want to rule in or out if you found something on this. Regardless of that, I mean, she has potentially some chronic leg pain that should be worked up and people haven't worked it up because she has really nothing else to help them.

*Id.* at 294. Dr. Gans did not have an "infectious explanation" for I.P.'s recurring pain. *Id.* at 295.

Dr. Gans testified she had not seen any data suggesting that the subject vaccinations could cause CNO. Tr. at 298. The sole case report produced by Petitioners involved onset of CNO symptoms two years after vaccination, which did not suggest a causal relationship. *Id.* at 298-99. A different study reporting the development of bone lesions in dogs after immunization showed increased levels of IL-10, not decreased levels, which was not consistent with Dr. Zizic's theory. *Id.* at 300. Dr. Gans stated that the leading theory involving mice animal models suggests that the microbiome might be involved in CNO. *Id.* at 302-03.

Dr. Gans disagreed with Dr. Zizic that a six-to-eight-week onset of CNO following vaccination would be temporally appropriate. Tr. at 303-04. Furthermore, Dr. Gans reiterated her opinion that the November 27, 2015 ER visit did not mark the onset of I.P.'s osteomyelitis; her osteomyelitis began in late December 2015. *Id.* at 303-05.

On cross, Dr. Gans agreed that it was appropriate for I.P.'s rheumatologist to include CNO on the differential diagnosis. Tr. at 312-13. However, the workup was never finished, and the diagnosis was not made definitively. *Id.* at 314. Dr. Gans acknowledged that I.P. was documented walking with a limp in February 2016, about two months after her initial treatment for osteomyelitis. *Id.* at 318. She maintained that I.P. did not have other objective signs of pain, merely subjective reports of pain and limping from I.P.'s parents. *Id.* at 319-20.

Dr. Gans agreed with Dr. Zizic that she could not definitively establish whether I.P. had bacterial or non-bacterial osteomyelitis based on how I.P. improved when "two therapy protocols were administered simultaneously." Tr. at 337. She pointed out, however, that antibiotics were administered "around-the-clock," while Tylenol and Advil were administered inconsistently. *Id.*

Dr. Gans testified that CNO is an autoinflammatory process and occurs in a genetically susceptible individual who does not manufacture IL-10 properly. Tr. at 332. She agreed that one proposed pathogenesis for CNO is that proinflammatory cytokines are not "held in check by anti-inflammatory cytokines properly." *Id.* at 333. She also agreed that vaccines can also incite IL-6 and TNF-α, pro-inflammatory cytokines. *Id.*

## IV. APPLICABLE LAW

### A. Petitioner's Burden in Vaccine Program Cases

Under the Vaccine Act, a petitioner may prevail in one of two ways. First, he may show that he suffered a Table injury within the time provided in the Table. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Second, where the alleged injury is not listed in the Table, he may demonstrate that he suffered an "off-Table" injury that was caused-in-fact by his vaccination. § 11(c)(1)(C)(ii).

For both Table and non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 13(a)(1). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010); *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). The petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or the opinion of a competent physician. § 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a non-Table claim, a petitioner must satisfy all three of the elements established by the Federal

Circuit in *Althen v. Secretary of Health and Human Services*. 418 F.3d 1274 (Fed. Cir. 2005). *Althen* requires a petitioner to establish by preponderant evidence that the vaccination caused his injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278.

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, a petitioner must provide a "reputable medical theory" demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs*., 35 F.3d 543, 548 (Fed. Cir. 1994) (citations omitted). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548-49; *Bunting v. Sec'y of Health & Hum. Servs.,* 931 F.2d 867, 873 (Fed. Cir. 1991).

A petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325-26). Despite their expertise, special masters are not empowered by statute to conclusively resolve what are complex scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. However, this does not negate or reduce a petitioner's ultimate burden to establish his entitlement to compensation by preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs*., 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326 (stating that "medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the existence of medical records and/or statements of treating physician views does not require the special master to adopt their conclusions *per se*. § 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct–that it must be accepted in its entirety and cannot be rebutted."). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should also be weighed against other, contrary evidence in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs*., 100 Fed. Cl. 742, 749 (2011) (it was not arbitrary or capricious for special master to weigh

competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Caves v. Sec'y of Health & Hum. Servs*., No. 06-522V 2011 WL 1935813, *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed. App'x 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically acceptable temporal relationship." *Id.* Thus, a petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs*., 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also be consistent with the theory for how the relevant vaccine can cause the alleged injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs*., 101 Fed. Cl. 532, 542 (2011), *recons. denied after remand on other grounds*, 105 Fed. Cl. 353 (2012), *aff'd without op.,* 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs*., No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

**B. Law Governing Analysis of Fact Evidence**

The process for making factual determinations in Vaccine Program cases begins with analyzing the medical records, which are required to be filed with the petition. §11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." §13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs*., 3 F. 3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given later, provided that such determination is based on a rational analysis).

Medical records created contemporaneously with the events they describe are generally trustworthy, because they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions," where "accuracy has an extra premium." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (quoting *Cucuras*, 993 F.2d at 1528). Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *See generally Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475 at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony, especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally

been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony could be more persuasive than written medical records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent.") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, the special master should assess each witness's credibility when determining the weight their testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In deciding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, a rational analysis must be explicated. *Burns*, 3 F.3d at 417.

### C. Analysis of Expert Testimony

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his or her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592-95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than they do in other federal judicial proceedings. Those factors are employed by judges to exclude evidence that is unreliable and potentially confusing to a jury. In Vaccine Program cases, these factors are generally used to assess the reliability and weight of scientific evidence. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of

expert testimony already admitted[.]"). The flexible use of the *Daubert* factors to evaluate persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 743.

Respondent frequently offers one or more experts of his own to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion/ proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). A "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis special masters must employ in Vaccine Program cases. *Id.* at 1325-26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("[T]his court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

### D. Consideration of Medical Literature

Finally, although this decision discusses some but not all the medical literature in detail, I have reviewed and considered all the medical records and literature submitted in this matter. *See Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'") (citation omitted), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015).

## V. <u>ANALYSIS</u>

The parties dispute the relevant diagnosis and whether I.P.'s condition was caused by the vaccines she received on September 10, 2015. Petitioners contend that I.P. developed CNO caused by the subject vaccinations. *See* Pet'rs' Post-Hrg. Br. at 27-52. Respondent argues I.P. developed bacterial osteomyelitis that was not caused by the subject vaccinations. Resp't's Post-Hrg. Br. at 16-19, 20-23.

The disagreement concerning diagnosis was the primary focus of the expert reports and hearing testimony. Ultimately, though, I need not resolve this issue, because even assuming *arguendo* that I.P. developed CNO as alleged, the evidence did not preponderantly establish the subject vaccinations caused that condition, as I will discuss below.

### A. *Althen* Prong One

In the context of the Program, "to establish causation, the standard of proof is preponderance of evidence, not scientific certainty." *Langland v. Sec'y of Health & Hum. Serv.*, 109 Fed. Cl. 421, 441 (Fed Cir. 2013). Petitioner's burden under *Althen*'s first prong is to provide a medical theory causally connecting the vaccination and the injury. *Id.* This theory must be sound and reliable. *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019).

1. Chronic Nonbacterial Osteomyelitis

CNO is a bone disease that primarily affects children. *Ferguson* at 130. It is characterized by recurring, sterile bone inflammation that causes bone pain. *Id.* It can present with swelling and tenderness over the affected bones, and it can have an insidious onset. First Gans Rep. at 9-10; *Ferguson* at 131. Classic findings include a swollen clavicle and lesions affecting the metaphyses and epiphyses of the femur, tibia, or humerus. *Roderick* at 41. Active recurrences of the disease are assessed through imaging and by measuring inflammatory markers, subjective symptoms, and physical exam findings. *Id.* at 44. NSAIDs are given as the first-line therapy and can produce remission in many patients. *Id.* at 43. Other treatments include corticosteroids, bisphosphonates, and biologics like infliximab and tumor necrosis factor ("TNF") receptor antagonists. *Id.* at 43-44. In up to 25% of cases, CNO is comorbid with other inflammatory diseases. *Ferguson* at 131. The most common are palmar planta pustulosis, psoriasis vulgaris, and inflammatory bowel disease. *Id.*

The experts agreed that CNO is an autoinflammatory condition. First Zizic Rep. at 23; First Gans Rep. at 9. This means the pathogenesis of the disease primarily involves the innate immune system, as opposed to the adaptive immune system. First Zizic Rep. at 23; *see Rigante* at 892 (noting that autoinflammatory diseases are characterized by the "absence of pathogens, circulating autoantibodies, or self-reactive T cells"); *Savic* at 505 (autoinflammatory diseases are characterized by recurrent episodes of inflammation without high levels of autoantibodies or antigen-specific T cells).

Dr. Zizic opined that CNO is the product of innate immune system dysfunction, leading to an imbalance of pro- and anti-inflammatory cytokines. In *Hofmann*, the authors found impaired expression of the anti-inflammatory cytokine interleukin-10 ("IL-10") in CNO monocytes. *Hofmann* at 323. Similarly, *Hedrich* reported that serum of untreated CNO patients had elevated levels of the pro-inflammatory cytokines IL-6 and TNF-α, "while IL-10 was not detectable in a single patient included in our study." *Hedrich* at 4. Dr. Zizic proposed that this cytokine imbalance can lead to immune cell infiltration into the bone, pathogenically activating osteoclasts and causing osteoporosis and bone remodeling. First Zizic Rep. at 25; *Hedrich* at 6. Dr. Gans did not dispute this general description of the pathogenesis of CNO. *See* First Gans Rep. at 11-12.

The precise etiology of CNO is unclear, but there is some evidence of a genetic predisposition. First Zizic Rep. at 24. *Golla* reported a significant association between CNO and an allele of marker D18560 on chromosome 18q. *Golla* at 217. CNO is also a prominent phenotype associated with the genetic syndrome DIRA ("deficiency of the IL-1 receptor antagonist"). First Zizic Rep. at 24; *see Savic* at 510. A subset of CNO patients have the genetic condition Majeed syndrome. First Zizic Rep. at 24; *see Ferguson* at 131. The research into DIRA

and Majeed syndrome have implicated the cytokine IL-1 as a possible "key cytokine in disease pathogenesis" of CNO. *Ferguson* at 130.

Also, as Dr. Gans pointed out, there is evidence in animal models suggesting alterations in the microbiome could be responsible for triggering CNO. *See* First Gans Rep. at 10. In *Lukens*, investigators found changes in the microbiota of mice that had been genetically modified to spontaneously develop an osteomyelitis similar to CNO. *Lukens* at 1. Mice given a diet high in fat and cholesterol were protected against inflammatory bone disease and bone erosion. *Id.*

2. Petitioners' causation theory was unpersuasive.

Dr. Zizic opined that in the "right genetic host," a vaccine could induce an autoinflammatory disease like CNO. First Zizic Rep. at 24; *see also* Tr. at 67-69. He noted that certain dog breeds develop canine hypertrophic osteodystrophy ("HOD"), a condition similar to CNO, following vaccinations. He cited *Harrus*, *Abeles*, and *Ferguson*. In *Harrus*, the investigators compared two different vaccination protocols in Weimaraner puppies to assess the risk of developing HOD. *Harrus* at 27. One group was given a modified live canine parvovirus vaccine, followed two weeks later by a trivalent vaccine containing modified live canine distemper virus and adenovirus type 2 combined with *Leptospira* bacterin. *Id.* The other group was given three consecutive multivalent vaccines containing modified live canine distemper virus, canine parvovirus, parainfluenza, and adenovirus type 2 combined with *Leptospira* bacterin. *Id.* The second group had a higher rate of HOD and more episodes of symptoms. *Id.* The results suggested the vaccination protocol for Weimaraner puppies could affect the likelihood of developing HOD and its severity. *Id.*

In *Abeles*, six Weimaraner puppies from the same litter had HOD, five of which developed the condition within 10 days of being given a second dose of a modified live canine virus vaccine. *Abeles* at 130. The authors posited that these cases could have represented a postvaccinal syndrome, either due to direct viral infection and/or the adjuvants in the vaccine. *Id.* They suggested considering a modified vaccination protocol in Weimaraner puppies using killed vaccines or staggering of doses. *Id.*

*Ferguson* was a review of the literature on the pathogenesis and management of CNO. The authors referenced the studies on dogs and commented that HOD was often triggered by canine vaccinations in certain large breeds and that the disease often clustered within litters. *Ferguson* at 131. This indicated that a "single gene defect" could be responsible for HOD and supported the notion that CNO could be genetically caused as well. *Id.* Importantly, however, the *Ferguson* authors did not hypothesize that vaccinations could cause CNO in humans. Moreover, it is notable that the dogs in *Harrus* and *Abeles* were given live virus vaccines, which were not given to I.P. Thus, there are substantial differences between this case and the HOD literature. Overall, Dr. Zizic did not persuasively explain how one could reliably extrapolate the literature about HOD to I.P.'s case.

Dr. Zizic identified another autoinflammatory syndrome affecting humans, HIDS, that may be triggered by vaccinations. First Zizic Rep. at 27. HIDS is a hereditary disorder "characterized by lifelong recurrent inflammatory attacks, with fever as the most prominent

symptom[.]" *van der Hilst* at 301. It is caused by mutations in the gene that encodes mevalonate kinase. *Id.* The mechanism by which HIDS causes symptoms is believed to involve increased production of IL-1β, along with defective cell apoptosis. *Id.* at 302. This is thought to result in an "unbridled inflammatory response after a minor stimulus[.]" *Id.* In *van der Hilst*, the investigators consulted a database of suspected and confirmed HIDS patients with information that had been collected from physicians. *Id.* Of the HIDS patients included in the study, 63% reported that vaccinations triggered their initial attacks of symptoms. *Id.* at 303. However, the investigators did not do a controlled statistical analysis to confirm an association between vaccinations and attacks, nor did they expound on a potential causal mechanism. The purpose of the study was instead "to collect new data on clinical features of HIDS." *Id.* at 307. Also, Dr. Zizic did not provide a reliable basis to extend the study's findings to CNO, aside from the fact that both conditions are autoinflammatory and may involve cytokine dysregulation.

Dr. Zizic cited the *Karaca* case report. The patient there developed skin lesions after receiving bacillus Calmette-Guerin ("BCG") and diphtheria, tetanus, and pertussis ("DTP") vaccinations, beginning at two months of age. *Karaca* at 1. More than two years after the initial set of vaccinations, he developed pain and swelling in both ankles. *Id.* at 2. X-rays showed osteolytic lesions, and he was diagnosed with CNO as well as granulomatous pyoderma. *Id.* The case report authors felt his conditions were triggered by his vaccinations, but they did not provide a mechanistic theory or attempt to explain the long latency between vaccination and development of CNO symptoms. *Id.* This case report provided little support for Dr. Zizic's theory, as the clinical course of the child described differed significantly from I.P.'s case, including the fact that his CNO was not diagnosed until more than two years after vaccination. Moreover, case reports are generally weak evidence of vaccine causation. *See, e.g., Caves v. Sec'y of Health & Hum. Servs.,* No. 07-443V, 2010 WL 5557542, at *14 (Fed. Cl. Spec. Mstr. Nov. 29, 2010) (finding petitioner's "reference to case reports [did] not help her meet her burden demonstrating a persuasive and reliable theory causally connecting the [ ] vaccine to [the injury]."), *mot. for rev. den'd*, 100 Fed. Cl. 119 (2011), *aff'd,* 463 F. App'x 932 (Fed. Cir. 2012).

In sum, Petitioners demonstrated that CNO is an autoinflammatory condition likely caused by an imbalance of inflammatory cytokines. But the evidence tying CNO to the subject vaccines (or to any vaccine) was very thin at best and was insufficient to show a sound and reliable theory of causation. This was inadequate to satisfy *Althen* prong one.

### B. *Althen* Prong Two

*Althen* prong two requires proof of "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278. The sequence of cause and effect must be "'logical' and legally probable, not medically or scientifically certain." *Andreu*, 569 F.3d at 1380 (quoting *Knudsen*, 35 F.3d at 548-49). A petitioner is not required to show "epidemiologic studies, rechallenge, the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1325. Instead, circumstantial evidence and reliable medical opinions may be sufficient to satisfy the second *Althen* prong. *Id.* Further, special masters are expected to consider the views of treating doctors. *Id.* at 1326. Such views are often persuasive because the doctors have direct experience with the patient whom they are diagnosing -- but they

are not necessarily dispositive of the causation question. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09-293V, 2015 WL 3640610, at *20 (Fed. Cl. Spec. Mstr. May 22, 2015). Finally, although a petitioner does not bear the burden of eliminating all alternative causes for his injury, it is appropriate for a special master to consider evidence relating to such alternative causes in assessing the *Althen* prongs. *Winkler v. Sec'y of Health & Hum. Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023); *Doe 11 v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1357-58 (Fed. Cir. 2010); *Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007).

The record here does not preponderantly support a logical sequence of cause and effect between I.P.'s vaccinations and the development of her condition (assuming she developed CNO, as alleged). Initially, because there is insufficient evidence to support the claim that the subject vaccines could cause CNO, it follows that could not be a logical connection between the vaccinations and I.P.'s CNO. Also, as Dr. Gans persuasively commented, there is no evidence that I.P had symptoms indicative of a pathogenic innate immune response in the days after vaccination, such as local swelling, fever, or redness. First Gans Rep. at 12. This position was corroborated by the contemporaneous medical records. *See* Ex. 5 at 66 (I.P.'s November 27, 2015 ER visit, which includes no mention of symptoms in the days following I.P.'s vaccinations); Ex. 2 at 158 (I.P.'s December 30, 2015 ER visit, with no mention of symptoms in the days after the vaccinations); Ex. 1 at 1 (Mrs. Pryor's affidavit saying I.P. first developed fever, chills, fussiness and coughing about six to eight weeks after the vaccinations); Tr. at 7-8 (Mrs. Pryor's testimony that about six to eight weeks post-vaccination, I.P. became "very temperamental," "was very clingy," always wanted to be carried, had "fevers and chills," and walked with a limp; her parents believed her symptoms were behavioral and did not seek medical care at that time). This undercuts Dr. Zizic's theory that a vaccine-caused pathogenic innate immune response caused I.P.'s condition. Lastly, no treating physician attributed I.P.'s bone condition to the vaccines she received on September 10, 2015. Thus, *Althen* prong two was not satisfied.

### C. *Althen* Prong Three

*Althen* prong three contains two parts. First, a petitioner must establish the "timeframe for which it is medically acceptable to infer causation," and second, he must demonstrate that the onset of the disease occurred in this period. *Shapiro,* 101 Fed. Cl. at 542-43.

Three types of evidence were provided concerning *Althen* prong three: medical records, Mrs. Pryor's affidavit and hearing testimony, and expert opinions.

#### 1. Medical records

I.P. received the subject vaccinations on September 10, 2015. Ex. 2 at 47-48, 51. About 11 weeks later, on November 27, 2015, she went to the ER for a reported "left leg injury" that had occurred the previous day. Ex. 5 at 66. I.P.'s left leg was x-rayed, revealing "extensive soft tissue swelling around the distal femur with small knee joint effusion." *Id.* at 69. There was a bruise on her left anterior tibia. *Id.* at 67. She was diagnosed with a URI and discharged home. *Id.* at 70. She was observed to be limping at the time of discharge. *Id.*

On December 30, 2015, I.P. was brought to urgent care, this time for right leg symptoms. Ex. 2 at 158. Petitioners reported that I.P. had sustained a left leg injury in November and had fully recovered. *Id.* One week before the visit (about 15 weeks after the vaccinations), she began limping on the right leg. *Id.* An MRI of the right leg was done, revealing findings concerning for osteomyelitis. Ex. 4 at 240-41. I.P. was diagnosed with subacute osteomyelitis of the femur and treated with IV antibiotics. *Id.* at 214.

2. Mrs. Pryor's testimony

In her affidavit, Mrs. Pryor stated that about six to eight weeks after the vaccinations (i.e., between October 22 and November 5, 2015), she noticed "huge changes" in I.P., including fevers, chills, coughing, and clinginess. Ex. 1 at 1. At the hearing, Mrs. Pryor similarly testified that I.P. began having fevers, chills, crying, and clinginess about six to eight weeks after the vaccinations, and she also began limping. Tr. at 7-8. Mrs. Pryor believed these were toddler behaviors that did not require medical attention, so she initially did not take I.P. to the doctor. *Id.* at 8. But by November 27, 2015, I.P.'s symptoms of fever, crying, and walking funny had gotten to the point where she needed to go the ER. *Id.* at 12.

3. Expert opinions

*Dr. Zizic*: Dr. Zizic opined that I.P.'s left leg symptoms on November 27, 2015, and her right leg symptoms in December 2015 were part of the same disease process (CNO). Tr. at 73. He pointed to I.P.'s elevated CRP level, high fever, and normal white blood cell count on November 27, 2015, arguing those markers indicated a systemic inflammatory process consistent with CNO and inconsistent with a traumatic injury. *Id.* at 74, 119-20. He further argued that CNO develops insidiously, so the beginning of the disease process in I.P would have been earlier than the onset of the clinical symptoms in her left leg. *Id.* at 112. Dr. Zizic estimated that CNO began developing about one month prior to the appearance of I.P.'s left leg symptoms, or about October 27, 2015. *Id*. at 114. He based this estimate on the time between her first and second hospital visits for leg pain:

> [At the November 27, 2015 ER visit] the [right] leg is asymptomatic. And then around six, seven weeks later, from [November 27, 2015] to December 31st, a little over four weeks, five weeks, let's say, she's got a hole in her bone. So this [left side] is going on and not yet with bone lesions you can see on x-ray. So extrapolating from that, I would look back and say sometime around a month earlier is when it began on the left side….So October 27th or something like that. I'm just trying to do the best I can to give you an answer that I can justify, I mean that I can support.

*Id*. Thus, Dr. Zizic placed the onset of I.P.'s CNO at 47 days after vaccination. But he admitted that he had no way of determining exactly when I.P.'s disease first began, allowing that it could have been weeks or months after the vaccinations. *Id.* at 185.

Dr. Zizic opined that a six-to-eight-week onset of CNO following vaccination was medically appropriate. First Zizic Rep. at 28. He conceded, however, that he had no literature to support this opinion. Tr. at 182-83.

*Dr. Gans*: Dr. Gans countered that I.P.'s symptoms on November 27, 2015, were unrelated to any form of osteomyelitis. Tr. at 274. That day, I.P. had substantial swelling and bruising of her left knee, suggesting a trauma, and her parents reported a possible fall or ball dropped on I.P.'s foot. *Id.* at 275-26. The injury affected the knee joint, not the bone, as would be expected in osteomyelitis. Ex. A at 9. The elevated inflammatory markers observed at that time were related to a URI. Tr. at 275-76. Moreover, I.P.'s CRP level was too high to be characteristic of CNO. *Id.* at 281. Dr. Gans placed onset of I.P.'s osteomyelitis 3.5 months after vaccination, when I.P. presented for one week of right leg pain. First Gans Rep. at 9. This was too long for the vaccines to have caused CNO, particularly in light of the theory that the vaccines caused the condition by eliciting short-lived inflammatory materials like cytokines. *Id*. at 12.

4. <u>Analysis</u>

I find that the onset of I.P.'s osteomyelitis was about 3.5 months after the subject vaccinations, or about one week before her presentation for right leg pain on December 30, 2015, consistent with Dr. Gans's opinion. Dr. Gans supported her opinion using the contemporaneous medical records and imaging showing a bone lesion on December 30, 2015. She persuasively argued that the examination and imaging on November 27, 2015, were more indicative of a traumatic injury of the left leg, not osteomyelitis, and I.P.'s elevated inflammatory markers and fever were explained by the URI she was experiencing the same day.

Although Mrs. Pryor testified that I.P. developed a series of symptoms about six to eight weeks after vaccination, the contemporaneous medical records did not align with that account. The medical records did not reflect any report by Mr. and Mrs. Pryor that I.P. had *any* symptoms before the injury precipitating the November 27, 2015 ER visit, much less weeks of fevers, chills, crying, or limping. To overcome the presumption that contemporaneous written medical records are accurate, contrary testimony from a witness must be "consistent, clear, cogent, and compelling." *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808 V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). Mrs. Pryor's story, given several years after the relevant events, was insufficient to overcome the presumption of the accuracy of the contemporaneously created medical records, which did not document any reports of fussiness, fevers, leg pain, or chills in I.P. around October-November 2015.

Furthermore, even if I were to credit Mrs. Pryor's testimony, Dr. Zizic did not opine that the symptoms Mrs. Pryor described were indicative of the onset of CNO in I.P. Instead, Dr. Zizic relied on I.P.'s bloodwork and imaging to speculate that her CNO began developing in late October 2015. *See* Tr. at 114, 120. However, Dr. Zizic's opinion was speculative and unpersuasive. I.P.'s osteomyelitis on her right femur was visible on her December 30, 2015 x-ray after one week of limping. Her left leg x-ray on November 27, 2015, showed no bone lesion, yet Dr. Zizic still claimed the onset of CNO had begun weeks before. In the end, the only facts supporting Dr. Zizic's onset opinion were non-specific readings, such as a high CRP level, and knee swelling, both of which were more likely explained by other causes, as Dr. Gans stated.

Lastly, Dr. Zizic had no literature to support his opinion that the onset of CNO six to eight weeks after the vaccinations was medically appropriate.[10] In fact, as Dr. Gans persuasively noted, this position was inconsistent with Dr. Zizic's proposed causation theory involving short-lived cytokine-driven inflammation.[11] Thus, I conclude that *Althen* prong three was not preponderantly satisfied.

## VI. CONCLUSION

Although I am sympathetic to I.P.'s and Petitioners' ordeal, upon careful evaluation of the record in this matter, I conclude that the evidence does not preponderantly show Petitioners are entitled to compensation under the Vaccine Act. **I therefore DENY entitlement. The clerk shall enter judgment accordingly.**[12]

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master

---

[10] Dr. Zizic did not attempt to argue a 3.5-month onset interval of CNO following vaccination was medically appropriate.

[11] Dr. Zizic pointed out that cytokine half-life is not determinative of the duration of the autoinflammatory response once it is triggered in the body. Second Zizic Rep. at 4. Again, though, he could not cite any literature supporting the onset timeframe for CNO that he proposed.

[12] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.